ESTATE OF DWIGHT B. ROY, JR., THE CONNECTICUT BANK AND TRUST COMPANY AND MARY C. ROY, EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 542-69. Filed June 18, 1970.

*Sidney D. Pinney, Jr.,* for the petitioner.
*Rudolph J. Korbel,* for the respondent.

1318

1320

Section 2037(a) provides for inclusion in the decedent's gross estate of property which the decedent has transferred if two conditions are met:

(1) possession or enjoyment of the property can, through ownership of such interest, be obtained only by surviving the decedent, and

(2) the decedent has retained a reversionary interest in the property * * * and the value of such reversionary interest immediately before the death of the decedent exceeds 5 percent of the value of such property.

The question presented herein concerns only the second of these conditions, more specifically, whether the reversion retained by the decedent exceeded, immediately prior to his death, 5 percent of the value of the property transferred. The parties agree with respect to the applicability of the first condition set forth in paragraph (1) above.

The facts involved are not complex and they are largely uncontested. On October 27, 1959, the decedent, who was then approximately 41 years old, and his brother transferred certain property in trust. Decedent's father, Benjamin, who was then approximately 69 years

of age, was to have a life interest in the trust's net income.[3] Upon Benjamin's death the trust corpus was to revert to the grantors, if living. If either grantor predeceased Benjamin his share of the trust corpus was to be administered for the benefit of his family.

Although the decedent was in relatively good health at the inception of the trust, in 1952 it was discovered that he was afflicted with glomerulonephritis. He, nonetheless, remained clinically well for approximately 11 years. In November of 1963 his condition began to steadily worsen until he succumbed to uremia on April 28, 1965. Benjamin did not die until approximately 4 years later, on April 6, 1969.

The controversy at issue arises because just prior to the decedent's death the state of his health indicated a severely limited, actual life expectancy, while the respondent's mortality tables indicate an expectancy for a man of 47, in normal health, of considerably longer duration. If we consider the decedent's actual health in valuing his reversionary interest, that interest would have been less than 5 percent. If we are bound to consider only the average life expectancy of those in normal health as reflected in the mortality tables, his interest would have been approximately 70 percent [4] as the respondent contends. The issue is thus narrowed to whether the decedent's personal life expectancy may be considered for purposes of valuing his reversionary interest under section 2037(a)(2).

Section 2037(b) prescribes the methods of evaluating reversionary interest as follows:

The value of a reversionary interest immediately before the death of the decedent shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, under regulations prescribed by the Secretary or his delegate.

Since it is the method of evaluation that is at issue here, construction of the language quoted above will be determinative.

The predecessor of section 2037(a)(2) and (b) was enacted as section 811(c)(2) of the Internal Revenue Code of 1939 by section 8 of the Technical Changes Act of 1949.[5] Prior to the enactment of this section, section 811(c)(1)(C) of the 1939 Code simply provided for the inclusion in the decedent's gross estate of interests that the decedent had transferred which were "intended to take effect in possession or enjoyment at or after his death."

---

[3] We note that at the time of the transfer in trust the decedent was in clinically good health. If one were to view the decedent's life expectancy as of 1959 the facts would seem to indicate that the value of the transferred interest would eventually be included in the decedent's gross estate under either sec. 2037 or, if he should survive his father, under 2033.

[4] Table 38 of United States Life Tables 1939–1941, published by the U.S. Department of Commerce, Bureau of Census. Sec. 20.2031–7(e), Estate Tax Regs.

[5] Although the Technical Changes Act provision was only applicable to pre-Oct. 8, 1949, transfers, its operation was extended in 1954 with the enactment of sec. 2037.

Consequently, in *Estate of Spiegel* v. *Commissioner*, 335 U.S. 701 (1949), the Supreme Court required inclusion of a trust of approximately $1,140,000 due to the retention of a $70 reverter. See *Estate of Spiegel* v. *Commissioner, supra* at 727 (Burton, J., dissenting). It was the congressional reaction to this decision which provided the impetus for the enactment of section 8 of the Technical Changes Act of 1949. S. Rept. No. 831, 81st Cong., 1st Sess., p. 8.

The circumstances surrounding this enactment indicate Congress' intention to reverse the holding in *Estate of Spiegel* v. *Commissioner, supra*, by the incorporation of a *de minimis* standard determinable with some mathematical precision. Certainty is of benefit to taxpayer and Internal Revenue Service alike.

As the statute obviously recognizes, no single method of valuation of a reversion can be prescribed in view of the large variety of reversionary interests.[6] There must necessarily be some flexibility in the means used to make the appraisal. Thus, it is that mortality tables would be of little use in valuing an interest the receipt of which is contingent upon someone dying without issue. Yet there are, it is equally obvious, certain reversionary interests where the use of a mortality table is the fairest and most equitable method to be used.

In the case at bar petitioner would have us ignore the life expectancy as reflected in the mortality tables and use, in lieu thereof, the actual life expectancy of the decedent here involved. Admittedly such a position has appeal and ignites a sympathetic reaction under the facts here present.[7] Further, the position is ably argued in the briefs.

Yet we feel its acceptance would emasculate section 2037 thereby vitiating the congressional intent to bring certainty to the law through the enactment of a *de minimis* provision. It would effectively write the words "including the use of tables of mortality" out of the statute. Surely Congress had certain reversionary interests in mind when it prescribed mortality tables as a means of evaluation. It is difficult to conceive of a "section 2037 reversion" where the use of such tables would be more appropriate than the one before us. Thus, to deny the applicability of the "tables of mortality" language here would be to ignore what appears to be the specific mandate of Congress.

Should we accept the petitioner's arguments herein, section 2037 would not apply to comparable reversionary interests in any instance where the decedent was terminally ill prior the death. In cases of that sort a drastically foreshortened actual life expectancy would bring

---

[6] The predecessor of this language was also contained in the Technical Changes Act of 1949. The applicable committee reports state that usual methods of valuation are to be used and, "The rule of *Robinette* v. *Helvering,* 318 U.S. 184, under which a reversionary interest not having an ascertainable value under recognized valuation principles is considered to have a value of zero, is to apply." See H. Rept. No. 1412, 81st Cong., 1st Sess., p. 7. However, see S. Rept. No. 1622, 83d Cong., 2d Sess., p. 469.

[7] However, we must be mindful of the old adage that "hard cases make bad law."

any retained reversion below the 5-percent level. Section 2037 would then be applicable only in cases of sudden death; e.g., when a healthy individual is killed in an accident or when an ostensibly healthy individual dies as the result of a sudden coronary. We do not feel it reasonable to assume that Congress intended section 2037 to be limited to such narrow circumstances. Nor can we believe that Congress intended the mode of death, lingering or sudden, to be determinative of estate tax consequence.[8]

Section 2037(b) states that the value of a retained reversionary interest "shall be determined (without regard to the fact of the decedent's death) * * *." If we were in the future to consider the manner of cause of a decedent's death we would, it seems to us, be in violation of this requirement.

By adopting the above construction of section 2037, as contrasted with petitioner's, we have stayed within the framework of the rule of statutory construction set down by the Supreme Court in *Sunshine Coal Co.* v. *Adkins*, 310 U.S. 381, 392 (1940), wherein it was said that an "alternative [which would seriously impair the effectiveness of a statue] will not be taken where a construction is possible which will preserve the vitality of the Act and the utility of the language in question."

It follows from the foregoing that we believe the Commissioner was merely following the edict of Congress when, in section 20.2037-1(c) (3) of the Estate Tax Regulations, he invoked the applicable provisions of section 20.2031-7, Estate Tax Regs., to limit the valuation method to be used with respect to reversions such as the one at issue to that contained in the mortality tables.

Section 20.2037-1(c)(3), Estate Tax Regs., provides in applicable part as follows:

(3) For purposes of this section, the value of the decedent's reversionary interest is computed as of the moment immediately before his death, * * * and without regard to the fact of the decedent's death. The value is ascertained in accordance with recognized valuation principles for determining the value for estate tax purposes of future or conditional interests in property. * * * For example, if the decedent's reversionary interest was subject to an outstanding life estate in his wife, his interest is valued according to the actuarial rules set forth in § 20.2031-7.

Section 20.2031-7(a)(2), Estate Tax Regs., in turn, reads in part:

(2) The present value of an annuity, life estate, remainder or reversion determined under this section which is dependent on the continuation or termination of the life of one person is computed by the use of Table I in paragraph (f) of this section. * * * If the interest to be valued is dependent upon more than one life or there is a term certain concurrent with one or more lives, see paragraph (e) of this section. * * *

---

[8] In this connection, see 54 Calif. L. Rev. 2180, 2186 (1966).

Paragraph (e) referred to in subparagraph (2) above relates to the actuarial computations to be used.

We will not overrule a regulation "except for weighty reasons [citation omitted]." *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). And legislative regulations may, indeed, be entitled to even greater weight. *Ruud Manufacturing Co.*, 10 T.C. 14, 17 (1948). In the instant case the respondent's regulations are clearly commensurate with the legislative purpose of bringing a degree of certainty to at least this portion of our tax laws. It certainly cannot be said that the regulations reflect an unreasonable interpretation of the statute. *Bingler* v. *Johnson*, 394 U.S. 741 (1969).

At trial one of the petitioner's witnesses stated that he was able to estimate decedent's life expectancy some 6 weeks and then again some 13 days before his actual death without reference to the fact of death. We attach little weight to such testimony given with respect to an individual clearly *in extremis*, and in view of the statutory language we find petitioner's cause deficient on this ground in addition to its misinterpretation of the legislative intent.

In support of its arguments petitioner, on brief, cites many cases in which this Court has held that mortality tables are merely evidentiary and will not be adhered to when more realistic or reliable measures are available.[9] However, these cases are distinguishable from the one at bar. They concern the valuation of a trust corpus for marital deduction purposes, a charitable remainder, a life estate, and certain annuities. It is true that in these cases we turned to the state of health of a particular individual; however, in no one of them was a statute rendered ineffectual by our so doing. In addition we were there concerned with the valuation of property or interests in property and not with the application of an exclusionary, *de minimis* rule of thumb.

In our research we have found but one decided case which treats the issue at bar.[10] *Hall* v. *United States*, 353 F. 2d 500 (C.A. 7, 1965), is indistinguishable from the instant case. However, we respectfully decline to follow *Hall* for the reasons stated above. See Stephens & Maxfield, Federal Estate and Gift Taxes 80 (2d ed. 1967) ; 54 Calif. L. Rev. 2180 (1966) ; 66 Col. L. Rev. 797 (1966). The *Hall* case was decided by the Court of Appeals for the Seventh Circuit; an appeal by the within petitioner would normally be venued in the Second Circuit under section 7482(b) (1) (A). Therefore, due to the fact that the Court

---

[9] See, e.g., *Estate of John P. Hoelzel*, 28 T.C. 384 (1957) ; *Estate of Nicholas Murray Butler*, 18 T.C. 914 (1952) ; *Huntington National Bank*, 13 T.C. 760 (1949) ; *Estate of Nellie H. Jennings*, 10 T.C. 323 (1948) ; *Estate of John Halliday Denbigh*, 7 T.C. 387 (1946). See also Rev. Rul. 66–307, 1966–2 C.B. 429.

[10] *Mears* v. *United States*, an unreported case (D. Mass. 1961, 8 A.F.T.R. 2d 6013, 61–2 U.S.T.C. par. 12,021), relies on mortality tables without mention of actual life expectancy. From this short opinion it is not possible to determine whether the issue was raised by the parties.

of Appeals for the Second Circuit has not yet ruled upon the issue we are not constrained to follow *Hall*. *Arthur L. Lawrence*, 27 T.C. 713, 717 (1957), reversed without discussion of this point 258 F. 2d 562 (C.A. 9, 1958).[11]

To reflect the foregoing and the concessions of the parties,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

---

[11] Although *Lawrence* was concerned with reconsideration of issues after reversal by a Court of Appeals we think its rationale applies here. Our recent opinion in *Jack E. Golsen*, 54 T.C. 742 (1970), does not affect the validity of *Lawrence* in this regard since the Second Circuit has not had the issue herein before it.